## CHICAGO, R. I. & P. RY. CO. v. STEPP et al.

(Circuit Court of Appeals, Eighth Circuit.   November 7, 1908.)

### No. 2,725.

**1. RAILROADS (§ 400\*)—ACTIONS—QUESTIONS FOR JURY—SIGNALS.**

In an action for the killing or injury of a person by a railroad train at a station, where there is testimony of apparently credible witnesses who had an opportunity to observe the fact that the bell or whistle on the engine was not sounded, although such testimony is necessarily negative and although it may be contradicted by positive testimony, the question is one for the jury.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 1373; Dec. Dig. § 400.\*

Injuries to persons at stations, see note to New England R. Co. v. Hyde, 41 C. C. A. 550.]

**2. RAILROADS (§ 400\*)—ACTION FOR INJURY TO PERSON AT STATION—QUESTIONS FOR JURY—RATE OF SPEED.**

Whether the running of a railroad train through station grounds at a certain rate of speed constituted negligence on the part of the company depends upon the surrounding circumstances, and, when in issue in an action for the killing of a person on the track, is a question for the jury.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 1374; Dec. Dig. § 400.\*]

**3. RAILROADS (§ 261\*) — COMPANIES LIABLE FOR INJURIES — JOINT USE OF TRACK.**

The fact that a railroad train owned by one company and operated by its servants, while being run over a track used jointly with another company, is subject to the rules and regulations of the latter company and the orders of its train dispatcher, does not relieve the owner from liability for an injury to a person by such train resulting from its negligent operation.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 824-827; Dec. Dig. § 261.\*]

**4. CARRIERS (§ 347\*) — INJURIES TO PERSONS AT STATION—CONTRIBUTORY NEGLIGENCE.**

A passenger before crossing a track at a railroad station while taking or leaving a train is not required, as a matter of law, to look and listen for approaching trains, but is simply required to exercise reasonable care in the light of all the circumstances existing at the time, and whether he exercises that care is a question of fact for the jury.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1363-1366, 1385-1397, 1402; Dec. Dig. § 347.\*]

**5. CARRIERS (§ 306\*) — INJURIES TO PERSONS AT STATION — CARE REQUIRED — JOINT USE OF STATION.**

A railroad company which entered into a contract entitling it to use station premises jointly with other companies came under the same duty as to passengers using the premises in connection with the other roads that it owed to its own passengers, and was required to operate its trains with the same due regard for their safety.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1249-1251; Dec. Dig. § 306.\*]

**6. RAILROADS (§ 372\*)—INJURY TO PERSON AT STATION—LIABILITY—NEGLIGENT OPERATION OF TRAIN.**

A railroad company which ran a train past a station at which another train was receiving and discharging passengers at a rate of speed which in itself constituted negligence under the circumstances is liable for an

injury to a person of which such negligence was the proximate cause, whether or not the particular injury that resulted could have been foreseen.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1267–1273; Dec. Dig. § 372.*]

7. CARRIERS (§ 238*)—INJURY TO PERSON AT STATION—ACTIONS—QUESTIONS FOR JURY.

An intending passenger walked from the platform of a railroad station across one track for the purpose of taking a train of a company which used the station jointly with defendant, then standing upon the second track and about to start. He attempted to enter on the side next the station, as was customary, as the train started, but the cars were vestibuled and the doors on that side closed, and being unable to enter he turned to go back to the station to wait for another train, when he was struck and killed by a train of defendant on the intervening track which was running at a speed of 40 or 50 miles an hour. Held, in an action to recover for his death, that he was a passenger with all the rights of one on the station grounds, and that the questions of defendant's negligence in the manner of running its train and of the contributory negligence of the deceased were properly submitted to the jury.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 973; Dec. Dig. § 238.*]

In Error to the Circuit Court of the United States for the Western District of Missouri.

For opinion below, see 151 Fed. 908.

On March 14, 1906, James M. Stepp, the father of the plaintiffs below, was struck and instantly killed by a train of the Chicago, Rock Island & Pacific Railway Company, the plaintiff in error, on the depot platform at Randolph, Mo., a suburban station accommodating 400 or 500 people, and located seven miles east of the Union Depot in Kansas City. The trains of three railway systems, the Wabash Railway Company, the Chicago, Burlington & Quincy Railway Company, and the Chicago, Rock Island & Pacific Railway Company, are operated past this station, jointly, over two main tracks. These tracks run east and west. The north track, owned by the Burlington Company, was used for west-bound trains, and the south track, owned by the Wabash Company, was used for east-bound trains. The plaintiff in error did not own either of the tracks, but, under the terms of a running agreement with the Burlington Company, had the right to operate its trains between Kansas City and Cameron Junction over the tracks of the Burlington Company, and over the joint track at Randolph. While using these tracks Rock Island trains were controlled by the rules and regulations of the Burlington Company, and were subject to the direction of its train dispatchers and other agents having control of the movement of trains. The station at Randolph is situated immediately south of the tracks. In front of it, and extending in an easterly and westerly direction parallel with the tracks and level therewith, was an ordinary depot platform 186 feet long and 8 feet wide. Immediately north of the north track, and level therewith, was an open platform, without cover of any kind, 96 feet long and 6 feet wide. Extending from the depot platform due north across the tracks, and across two switch tracks north of the main track, was a narrow platform or walk 15 feet wide, level with the tracks, and connecting the two platforms. On either side of this walk the space between the two platforms was filled with cinders flush with the track, and passengers going to and from trains were accustomed to walk over these cinders the same as upon the narrow walk just referred to. The space between the main tracks was 10 feet, about 4 feet of which would be covered by the overlapping of cars. Notwithstanding the north platform, passengers were accustomed to get on and off trains on the north track on the south side. The deceased was a farmer living a mile or more east of Randolph. On the morning of the accident he had sent his son to Kansas City with a load of hogs

to be sold on the market at the stockyards there. He himself intended to go to the city on the Burlington train which passed Randolph about 7:30 in the morning, to meet his son and look after the sale. He approached the station on a road from the east running parallel to and near the tracks. This road crosses the tracks at a point about 380 feet east of the center of the depot platform. When he reached that point he continued westward along a well-beaten cinder pathway south of the main track to the east end of the platform immediately in front of the depot and south of the tracks. As he reached the depot the west-bound Burlington train, which he intended to take, pulled in and stopped. It consisted of six coaches, and was about a block and a half long. The locomotive was at a point between 70 and 100 feet west of the depot. It was emitting smoke and steam. The morning was misty, and the wind in the northeast, so that the smoke and steam from the locomotive was blown down across the south track. On this track a Rock Island train was approaching from the west. Mr. Stepp crossed the south main track from the south platform, and endeavored to get aboard the Burlington train. He had the money to pay his fare, and intended in good faith to become a passenger. He found that he was at a vestibule car, and the door was closed. He then hurried forward to the next car platform, but this, too, was vestibuled and closed. The train was then moving out. He seized hold of the handholds and tried to get in while the train was in motion. The conductor or some other employé of the road was on the car platform, and some conversation passed between him and Mr. Stepp, but there is no trustworthy evidence as to what was said. Then Mr. Stepp abandoned his effort to gain admittance, and turned to go south to the station to wait for the next train. The second step brought him upon the south track, where he was struck by the Rock Island train, which was running through the depot grounds at a speed of from 40 to 50 miles an hour. The railroad track on which this train approached the station was straight, and the view along it unobstructed by permanent objects for a distance of a mile and a half or two miles.

The plaintiff charges the defendant with negligence in two particulars: First, that no bell was rung or whistle sounded by its train as it approached the station; and, second, that the train was running at a negligent rate of speed, not only in violation of law, but in violation of the rules of the company. At the close of all the evidence the defendant moved the court to direct a verdict in its favor. The refusal to grant that motion constitutes the only error assigned in this court.

Paul E. Walker (M. A. Low, on the brief), for plaintiff in error.

W. C. Scarritt (E. L. Scarritt and Elliott H. Jones, on the brief), for defendants in error.

Before HOOK and ADAMS, Circuit Judges, and AMIDON, District Judge.

AMIDON, District Judge (after stating the facts as above). There is the usual conflict in the evidence as to whether the signals were given, and in the briefs there is the familiar discussion of the relative weight of negative and positive evidence. In following out this distinction courts have sometimes overlooked the fundamental fact that in such a case the plaintiff is necessarily confined to negative evidence. If such evidence is unworthy of belief simply because it is negative, then the plaintiff must nearly always fail. The fact which he has to prove is negative, viz., that the bell was not rung or the whistle sounded; and the only way that fact can be established is to bring witnesses who were so situated that they would have heard the signals if they had been given, and who testify that they did not hear them. Such evidence, of course, ranges through all degrees of credibility. If the witness had been accustomed to hear

such signals frequently so that their impression would be deadened by habit, his testimony that he did not hear them would have no weight as against trustworthy affirmative evidence that the signals were given, unless the witness was able to testify to some circumstance showing that his attention was specially directed to the subject on the occasion in question. Again, if a witness situated so he could hear the signals, and of such experience that he would have been likely to notice them if they had been given, testifies that he did not hear them, the credibility of his evidence is for the jury, unless there is proof that his attention at the time was absorbed in some other matter. Finally, if the attention of a witness is especially directed to the train and its signals, and at the time a distinct impression is made upon his mind that the signals are not given, his testimony is in every particular as trustworthy, though negative, as would be the evidence of another witness similarly situated affirming that the signals were given. In either case the truth or falsity of the evidence depends upon the truthworthiness of the sense of hearing and the honesty of the witness testifying to the fact. It is likewise true that affirmative evidence on such a subject does not prove the fact simply because it is affirmative. It is subject to all the infirmities, bias, and interest to which all human testimony is subject. Such evidence is also frequently given by trainmen, who are accustomed to give the signals and to hear them. It is their habit to give such signals on approaching stations and highway crossings. The mere habit is likely to blur the memory of the fact. But after an accident has occurred nothing is more natural than for the memory of a trainman, unconsciously and by a well-recognized mental illusion, to raise a recollection of the giving of the signal, out of his previous habitual practice. That the signal was given springs up in his mind, not by a process of recollection, but as the result of a long-continued habit. This truth is well illustrated in the present case. The engineer of the Burlington train knew nothing of the accident at the time it occurred. He did not hear of it until some 25 minutes later, after reaching Kansas City. In the meantime he had necessarily heard numerous locomotive bells. His opportunity to observe the ringing of the bell on the Rock Island train was meager. His own train was just starting up, with the attendant noises of his locomotive. The Rock Island train swept by him at a speed of from 40 to 50 miles an hour. Still he testifies that looking through the cab window opposite him he saw the bell on the Rock Island locomotive swinging as it passed his cab. No circumstance is mentioned why this fact, which would be a usual occurrence in passing locomotives, and would have ordinarily made no impression upon his mind, did so impress his attention on the occasion in question that he was able to recall the fact after the accident. Affirmative evidence subject to so many possibilities of error is, of course, no more trustworthy than negative evidence. In the present case there were seven witnesses who testified that the signals were not given. Some of them were in a position especially favorable for observing the fact if it had occurred, and two of them at least had their attention directed to the

train as it approached the station. In opposition to this evidence two witnesses on behalf of the defendant testified that the bell was rung. One was the engineer of the Burlington train, and the other was a witness standing in the station who said that he noticed that the Rock Island bell was swinging as the train passed by, although at that very time his eyes were also fixed upon Mr. Stepp's peril and death. Such a conflict of evidence surely was for the consideration of the jury. As to the sounding of the whistle for the station, the conflict in the evidence is much more favorable to the defendant. Witnesses testified to circumstances which make it altogether probable that the station whistle was sounded. But such a warning of the approach of a train to a station where another passenger train is standing, and to and from which passengers are likely to be moving, would be a wholly inadequate warning of the danger. The attention of passengers under such circumstances is diverted by the necessary confusion which is always present on such an occasion, and a train which should pass rapidly through station grounds without giving a constant warning of its approach by the ringing of the locomotive bell would be manifestly guilty of negligence. We are, therefore, satisfied that the trial court committed no error in submitting this issue to the jury.

It was also for the jury to say whether the defendant was guilty of negligence in running its train past the station at the high rate of speed which is admitted. Our attention is called to numerous cases in which it is stated that railroads are themselves to be the judges of the speed at which they will run their trains, and that their judgment as to the proper requirements on this subject cannot, as a matter of law, be held to constitute negligence. In the cases in which the language was used the situation involved the speed of trains in the open country, and as to those situations the language was entirely proper. But negligence depends upon circumstances. It is too plain for controversy that railroads cannot be given an unrestricted discretion as to the speed at which they will run trains through station grounds. At such points railroads must operate their road with due regard to the safety of the public, and, if the matter were to be determined as a matter of law, we should have no hesitancy in saying that it was plainly negligent for the defendant to run its train past the station at Randolph, under the conditions existing there at the time, at the speed of 40 miles an hour. If such a speed is necessary, then the company was bound to safeguard the public by gates and signal men. Rule 10 of the Burlington Company was binding upon this train, and clearly forbade such a speed. It reads as follows:

"When passenger trains are receiving or discharging passengers at stations on double track or at points where they meet or pass other trains, all trains must approach under complete control."

It is seriously urged that if the trainmen in charge of the Rock Island train were guilty of negligence, either in the speed of the train or in omitting to give signals, the defendant cannot be held liable for their negligence, because while running upon these joint tracks they were subject to the rules and regulations and the train

dispatchers of the Burlington road. As to this contention it may first be answered that the speed of the train was the customary speed of all such trains at that station, and must therefore, be held to be the act of the defendant, and not of its agents. We would not, however, wish to rest our decision upon that ground alone. We are clearly of the opinion that the circumstances put forward to exempt the defendant from liability cannot be given any such effect. The fact that the train was run subject to the rules and regulations of the Burlington Company, and under the direction of its train dispatchers, did not make the Rock Island train a Burlington train, or its trainmen the servants of the Burlington road. This requirement grew out of the fact that two roads were using the same track at the same time. It was necessary that there should be a single authority to control the movement of the trains in order to secure safety in the operation of the road. That was the entire scope and effect of this requirement. The train was at all times a Rock Island train, and the employés upon it were its employés. That company had purchased the right by contract to run its trains over the track in question. The requirement that the employés should act under the rules and train dispatchers of the Burlington was simply an arrangement whereby they could efficiently and safely perform their service for the Rock Island Company. The authority mainly relied upon by the defendant in support of its position is Atwood v. Chicago, Rock Island & Pacific Ry. Co. (C. C.) 72 Fed. 447. We cannot approve of that decision in its holding as to the liability of the Rock Island Company upon the facts there disclosed. We think the learned judge who rendered the decision attached undue importance to the fact that the Rock Island trainmen there were subject to the rules and regulations and the train dispatcher of another company. Who has the right to control the conduct of an employé, is perhaps the most important circumstance in deciding the question as to whose servant he is. · It is decisive in cases to which it has been most frequently applied, namely, where the servant is at the same time in the general employment of one person, and the special employment of another. Such was the case of Donovan v. Construction Syndicate (1893) 1 Q. B. 629. There the defendants, who were the owners of a crane, lent it to another company, with an operator in their employ to run it. While using the crane in the service of the hirers, the operator was subject to their exclusive control and direction. For this reason it was held that while engaged on the machine for them he was their servant, and not the servant of the owners, although he was hired and paid by them. Chief Justice Cockburn, in Rourke v. Colliery Co., 2 C. P. Div. 205, states accurately both the rule and the circumstances to which it is applicable, as follows:

"When one person lends his servant to another for a particular employment, the servant, for anything done in that particular employment, must be dealt with as the servant of the man to whom he is lent, although he remains the general servant of the person who lent him."

In order to render one person the servant of another, however, he must be in some way, either generally or specially, actually in the

service of that other—working for him.  Judge Taft, speaking for the Court of Appeals for the Sixth Circuit, in Byrne v. Kansas City, Ft. Scott & Memphis Railway Co., 61 Fed. 605, 607, 9 C. C. A. 666, 24 L. R. A. 693, brings both requirements together when he asks in regard to an employé: "Whose work was the servant doing?" and "Under whose control was he doing it?"  The employés in charge of the Rock Island train were not working for the Burlington Company; it did not employ or have any right to discharge them; it owned no part of the train upon which they were working; and, finally, it had no interest, either by way of contract or ownership, in the service which they were performing.  They were not, therefore, its servants, notwithstanding, for purposes of safety to its own trains, they were subject to its rules and direction.  The duty to make reasonable rules and regulations, and to exercise reasonable supervision by means of train dispatchers, was the positive duty of the Rock Island Company— a duty which it owed both to its employés and the public.  It could not delegate that duty to another, and, when by agreement it placed its trains under the rules and regulations and the train dispatchers of the Burlington Company, it still remained as responsible for those rules, regulations, and directions as it would have been if they had been made or given by itself.  Again, it would be a dangerous doctrine to permit a railroad company, when charged with wrongful conduct, to escape liability upon the ground that the act was done pursuant to the rules and directions of another company to which it had by previous agreement delegated authority.  Such a holding would permit the direction of a third party to be set up as justification for a tort in its most vicious form.  It might be that if the Burlington Company had, either by its rules or its train dispatcher, directed the doing of the very act complained of, it, as well as the Rock Island Company, would be liable in damages; but surely the Rock Island Company could not be heard to plead those facts in exoneration of its own wrong.

The case of Smith v. St. Louis & San Francisco Railway Co., 85 Mo. 418, 55 Am. Rep. 380, when fully examined, will be found to rest upon different and satisfactory grounds.  There the Missouri Pacific Road entered into an agreement with the defendant in that case by which the former agreed to transport all of the passanger trains of the latter passing between the Union Station at St. Louis and the substation of Franklin, using for that purpose its own locomotive and crew, the San Francisco road simply furnishing the cars and the brakeman and conductor.  The San Francisco Company was to do no business between the stations mentioned, or intermediate stations.  The plaintiff bought a ticket of the Missouri Pacific Company to ride from the Union Station in St. Louis to Webster, an intermediate point, and took passage on a car owned by the San Francisco Company, and hauled by the Missouri Pacific under this agreement. The circumstances of the accident are stated in the opinion as follows:

"The train arrived at Webster about 10 o'clock at night, and stopped at the depot for passengers to get on and off.  It was a dark night, and the depot was not lighted, and in the act of getting off, or immediately after getting off, Smith fell between two of the cars, and at that moment the train started, and passing over him inflicted injuries of which he died soon after,

and his widow instituted this suit against the defendant to recover damages. The negligence alleged is that the train did not stop long enough to allow the deceased reasonable time to alight, and that the depot was not lighted."

Under all these circumstances it is entirely plain that the Missouri Pacific Railroad Company, and not the San Francisco Company, was responsible. Smith was its passenger. It was hauling the train and controlling its movements, and was entitled to all its earnings while passing over its road. It is not necessary to recount the circumstances of the present case to show that it is controlled by considerations fundamentally different from the case there involved.

The defense that the Burlington road, and not the Rock Island, was responsible for the negligence complained of, was in no way embodied in the answer, nor was it presented to the trial court. On the contrary, the answer admits that the defendant "was at all the times mentioned in the petition engaged in operating a railroad in the state of Missouri." It further admits that it "and other railroad companies were accustomed to and did run, conduct, operate, and manage cars and trains of cars" over the track in question, and admits "that the said James M. Stepp was struck and killed by a locomotive engine of this defendant," and admits that defendant, Louis Collier, was upon said engine, and operating the same "as the agent of this defendant, at said time and place." In the face of these admissions, even if there were merit in the defense itself, the defendant is precluded from urging it.

Was the deceased guilty of contributory negligence in failing to look and listen before attempting to cross the track upon which he met his death? It is conceded that he took neither of these precautions. If, however, he was entitled to the rights of a passenger while on the platform, he was not required to do so. It is now the settled rule of the federal courts that passengers using station premises for the purpose of taking or leaving trains have a right to assume that the place is one of safety, and to act upon that assumption. While they are not absolved from all care, they are not required to exercise that high degree of care which the law imposes upon travelers when approaching the intersection of a highway and a railroad. The traveler upon the highway has no right to assume that the railroad is a place of safety, or that trains will not be run over it while he is attempting to pass. On the contrary, the rule has been repeatedly declared that such a crossing is a place of danger, and that the traveler must approach it with the knowledge that the company may at any time be moving trains over its road. This is the ground of the difference between the rule as to a passenger while upon station grounds and a traveler upon the highway. The one has the right to believe that the place which he is using is one of safety, while the other is bound to know that the place which he is approaching is one of imminent danger. Upon the basis of this difference the rule is now firmly established that a passenger, before crossing a track while taking or leaving a train, is not required, as a matter of law, to look and listen for approaching trains. He is simply required to exercise reasonable care in the light of all the circumstances existing at the time, and

whether he exercises that care is a question of fact for the jury. Warner v. Baltimore & Ohio R. R. Co., 168 U. S. 339, 18 Sup. Ct. 68, 42 L. Ed. 491; Alabama & Great Southern Ry. Co. v. Coggins, 88 Fed. 455, 32 C. C. A. 1; Graven v. MacLeod, 92 Fed. 846, 35 C. C. A. 47; Chesapeake & Ohio Ry. Co. v. King, 99 Fed. 251, 40 C. C. A. 432, 49 L. R. A. 102. This rule is based upon the soundest considerations of public policy. While taking or leaving a train, the attention of passengers is necessarily absorbed in a multitude of considerations which make it impossible for them to exercise a careful watchfulness for approaching trains. There is usually considerable noise at such places. Frequently there is the meeting or leaving of friends. As a rule there is also haste and confusion. These and many other familiar circumstances confuse the mind, and render watchfulness impossible. The situation of Mr. Stepp is itself an impressive illustration. He arrived at the station a little late, and hastened to take the train. He rushed from one platform to another to enter, but found all entrance to the train barred. With his mind bewildered by this experience, he turned to go to the depot to wait for the next train, and was immediately struck and killed. All the circumstances mentioned were such as would throw the ordinary person off his guard, and to hold that one so situated ought to exercise the same care as a person approaching a highway crossing would be to confound situations that are fundamentally different and encourage carriers to disregard the safety of the public. The defendant attempts to withdraw the present case from the rule we have been considering upon the ground that Mr. Stepp was not a passenger as to the Rock Island Company at the time of the injury, and relies upon Chattanooga, R. & S. Ry. Co. v. Downs, 106 Fed. 641, 45 C. C. A. 511, McCann v. Chicago, Milwaukee & St. P. Ry. Co., 105 Fed. 480, 44 C. C. A. 566, and Elliott v. Chicago, Milwaukee & St. P. Ry. Co., 150 U. S. 245, 14 Sup. Ct. 85, 37 L. Ed. 1068, in which the courts have declined to extend the exemption in favor of passengers to employés or licensees. In our judgment Mr. Stepp had the rights of a passenger not only as to the Burlington road upon which he was intending to take passage, but as to all carriers operating trains through the station grounds. When the defendant entered into a contract entitling it to use the depot premises jointly with the other roads, it came under the same duty as to passengers using the premises in connection with other roads that it owed to its own passengers. Rule 10, already quoted, imposed that duty upon it. It was bound to know that passengers upon other roads would be using the premises, and to operate its trains accordingly. Mr. Stepp also had a right to assume, while properly using the depot premises, that the defendant would discharge its duty in this respect, and that no train would be driven over its tracks at a speed of 40 miles an hour at a time when passengers to or from the Burlington train were upon the platform. His right did not grow out of the contract of carriage, save only as that contract gave him the right to be upon the premises. Being there rightfully as a good-faith passenger, he had the right to assume that all carriers using the premises would have the same regard for his safety as the carrier upon whose road he was seeking

passage. Having failed to secure entrance to the train, he did not cease to be a passenger, but had all the rights of a passenger while returning to the depot for the purpose of waiting for the next train. At the time of his injury, therefore, he was clearly within the class which is exempt from the rule as to looking and listening for other trains, and his failure to take that precaution cannot be assigned as negligence on his part as a matter of law. The trial court, in a charge to which no exceptions were reserved, submitted to the jury the question whether Mr. Stepp was in the exercise of reasonable care. It would have been manifest error for it to withdraw the case from the jury and declare as a matter of law that the deceased was guilty of contributory negligence.

Deceased was not negligent in attempting to enter the train from the south side. The evidence shows that it was a regular practice of the traveling public to do this. No sign indicated that the north platform must be used in taking west-bound trains, nor did any employé point out that as the proper course. The construction of the depot ground afforded the only indication of the proper approach to trains, and that was quite consistent with the course adopted. The station was situated south of the track. That was the place where passengers were compelled to purchase their tickets, and where they would naturally wait for trains to pull in to the station and stop before attempting to take passage. It would have been unreasonable to expect the traveling public on a misty morning like the morning in question to take a stand upon the open platform and wait for an incoming train. There is no evidence that Mr. Stepp was aware that the cars were vestibuled and could be entered only from the north side. His conduct clearly indicates a different belief on his part.

Finally, it is insisted that the defendant ought not to be held liable because its engineer with an open track before him could not anticipate that deceased would step on the track immediately in front of the train. That, however, is not the test of defendant's liability. Its conduct in running its train past the station at 40 miles an hour while another passenger train was there receiving and discharging passengers was negligent, and the death of Mr. Stepp was the direct and proximate result of that negligence. The defendant is liable whether it could have foreseen the actual consequence of its negligence or not. The distinction made by Judge Mitchell on this subject in Christianson v. Chicago, St. P., M. & O. Ry. Co., 67 Minn. 94, 69 N. W. 640, is clear and sound. Of a similar contention he said:

"The doctrine contended for by counsel would establish practically the same rule of damages resulting from tort as is applied to damages resulting from breach of contract, under the familiar doctrine of Hadley v. Baxendale, 9 Exch. 341. This mode of stating the law is misleading, if not positively inaccurate. It confounds and mixes the definition of 'negligence' with that of 'proximate cause.' What a man may reasonably anticipate is important, and may be decisive in determining whether an act is negligent, but is not at all decisive in determining whether that act is the proximate cause of an injury which ensues. If a person has no reasonable ground to anticipate that a particular act would or might result in an injury to anybody then, of course, the act would not be negligent at all; but if the act itself is negligent, then the person guilty of it is equally liable for all its natural and proximate con-

sequences, whether he could have foreseen them or not. Otherwise expressed, the law is that if the act is one which the party ought, in the exercise of ordinary care, to have anticipated was liable to result in injury to others, then he is liable for any injury proximately resulting from it, although he could not have anticipated the particular injury which did happen. Consequences which follow in unbroken sequence, without an intervening efficient cause, from the original negligent act, are natural and proximate; and for such consequences the original wrongdoer is responsible, even though he could not have foreseen the particular results which did follow. Bevan, Neg. p. 85 (3d Ed.); Hill v. Winsor, 118 Mass. 251; Smith v. Railway Co., L. R. 6 C. P. 14. For citation of cases on this question, see 16 Am. & Eng. Enc. Law, p. 436 et seq.; also Shear. & R. Neg. § 28 et seq."

Lord Justice Blackburn stated the same rule tersely in the leading case of Smith v. London & Southwestern Ry. Co., L. R. 6 C. P. 14:

"What the defendants might reasonably anticipate is only material with reference to the question whether the defendants were negligent or not, and cannot alter their liability if they were guilty of negligence."

On all its issues this case is one eminently proper for the decision of a jury. It was submitted on a charge to which no exception was reserved, and the judgment in favor of the plaintiffs must be affirmed.